24964. BIBB MANUFACTURING CO. *v.* MARTIN *et al.*

DECIDED MARCH 13, 1936. REHEARING DENIED MARCH 31, 1936.

*Jones, Johnston, Russell & Sparks,* for plaintiff in error.
*Donald G. Stephenson,* contra.

MACINTYRE, J. The exception here is to the judgment rendered by the Honorable James C. Davis, Judge of the superior court of Newton County, affirming an award of the Department of Industrial Relations in favor of Mrs. Susie Martin individually, Mrs. Susie Martin for the use of Samuel G. Martin, and Samuel G. Martin, against Bibb Manufacturing Company. The controlling question in the case is whether or not at the time E. G. Martin, the husband of Mrs. Susie Martin and the father of Samuel G. Martin, was accidentally injured in the course of his employment with Bibb Manufacturing Company, he was a mere employee of that company or an independent contractor.

Mrs. E. G. Martin testified in substance that E. G. Martin was working for Bibb Manufacturing Company at Porterdale when he was injured on March 20, 1934; that he died the following day; that he received each week envelopes made out in favor of the men that were employed by him, in favor of Martin, and in favor of the teams and trucks; that Martin was paid $4 a day; that he was using "mostly" his farm hands at Bibb Manufacturing Company, and a few that were not farm hands; that she didn't know what his hands were being paid, but thought Martin was paid $4 a day for his teams and trucks; that for the past several years Martin's general business had been dairying and farming, and that he had been a contractor; that "the teams he was using at Bibb were also used on the farm," and that "the trucks were partly bought for his contract at Porterdale."

Samuel G. Martin testified in effect that his father, E. G. Martin, "was foreman of that job out there for the Bibb;" that he "hired the men that were working with him;" that he was killed while "hauling machinery from the box cars to the mill;" that witness

knew something of his father's contract by reason of the fact that, at the request of Bibb Manufacturing Company, he completed said contract; that he was paid the same as was his father—forty cents an hour; that "they" paid some of the hands $1.25 and some $1.50 a day in separate envelopes; that witness fixed the pay for the hands, and "used the same men he [his father] had on the books;" that witness "made out the pay-roll from one Friday to the next Thursday," and "sent it to the Bibb's office;" that witness did not pay the full amounts in the envelopes to the laborers, but paid "according to how they worked mainly;" that witness received the money in the envelope for the driver and truck, and paid the driver and "kept the rest;" that "we used one truck part of the time and two teams and another truck all the time;" that "when there was no lumber in the yard," he used only "the men cleaning out the place for the building;" that at the same time "this work was being done," witness's father used the truck he was using at the mill in delivering wood for the Bibb Manufacturing Company, which wood he got from his farm or bought and sold said company for $4.80 a cord.

J. O. Porter testified in substance that he was in charge of the Porterdale Mill for Bibb Manufacturing Company; that "his interpretation of Martin's business was that he was a farmer and contractor;" that for some time Martin had been contracting with Bibb Manufacturing Company to perform various sorts of work, and with others; that Martin said that he could not finance the contract in question, and witness agreed to "pay him a stipulated sum per hour for himself, a stipulated sum for his trucks and teams, and a stipulated sum for the operatives that he worked," Martin "to do the grading at the Osprey Mills for the new addition, empty cars for whatever material that came in, and place this material in the places that were designated by the construction crew;" that the total amount paid Martin under this contract represented "the cost of the construction so far as the Bibb Manufacturing Company was concerned;" that "payment was worked out on a basis of pay-rolls that he turned in to us each week;" that Bibb Manufacturing Company never hired any of the men working for Martin, or any of the trucks or teams that he used, and never paid any of said men; that payment of the employees was left entirely up to Martin; that Martin had no special time to work,

but "worked so that he could get the material unloaded to eliminate the leaving of it;" that Martin "worked his own crew," and "we didn't dictate to Mr. Martin as to how to work his crew;" that "results were all we were after;" that Martin "first excavated a place for the building," and then spent most of his time handling the brick for the crew working on the building; that witness did not make the contract with Martin to "haul machinery from the unloading place to the mill," and wouldn't say that it was a separate contract from the one in connection with the building of the addition at the Osprey Mills; that Martin asked that he be given the job of hauling the machinery "in connection with his former contract . . due to the fact that he didn't have enough . . continuous work to . . give his hands continuous work;" that Martin hauled the machinery on the same basis he worked in connection with the Osprey Mills; that witness did not know what Martin was paying his employees, or what his profits were; that neither Martin nor any of his employees were "carried under the code;" that after its employees had been working for it six months Bibb Manufacturing Company gave them insurance in a stated amount, but that no policy had been issued to Martin; that the paymaster "made out a pay envelope to Mr. Martin, to each one of his employees, and to the drivers of the trucks and teams," and delivered them to Martin, "who signed and receipted each one of them;" that Bibb Manufacturing Company had no right either "to hire or fire any of the employees;" that Martin was not paid at the rate of $4 a day, as stated by Mrs. Martin, but was paid forty cents an hour; that Martin was designated "foreman on the pay-roll because it was necessary to finance him" and "to have some designated title in order to be able to go on the pay-roll;" that Bibb Manufacturing Company based its pay-roll on the one submitted by Martin, relying on his honesty; that witness did not think that his company would have stood for Martin's claiming $3 a day for his hands; that the sum total of the money paid Martin in the manner indicated "was the total contract price for the work that was done;" that the "lump-sum figure" first suggested to Martin for doing the work and the basis of payment fixed by the contract turned out to be "approximately the same amount;" and that the method of payment under the contract was "merely another method of arriving at the approximate amount for the work."

W. C. Ivey testified in substance that he was "employment agent" for the Bibb Manufacturing Company and made the agreement with Martin to haul the machinery; that Martin told him that he "was about to catch up at the other building . . and wanted this job;" that when the machinery came in he called Martin and he "got his men and started to work;" that this "machinery was to go to another mill, and not to the Osprey addition;" that "he got the injury while unloading that machinery;" that witness gave Martin no employees of his company to assist Martin; that he sent nobody "to direct or control the manner of doing it;" that witness "just told him to do it," and "the manner and method of unloading it and putting it where" witness "wanted it was left up to him entirely;" that witness was "employment agent of the mill" and did not "execute contracts usually for the mill."

Eight "pay-roll sheets" were introduced in evidence. They are similar in form, and a description of the one for the week ending March 17, 1934, sufficiently indicates the nature of the others. It was headed "pay-roll sheet." At the top of the left side of the sheet appear the words "Construction Crew Dept." Under these words, and across the sheet, the following is typewritten: "Excavating, Hauling, & Unloading Material, Helping Carpenters & Brick Masons." Under those words on the left side of the sheet the word "Foreman" is typewritten. Immediately under that word is the name "E. G. Martin." To the right of Martin's name is the letter "A" (which appears from a printed statement on the left margin of the sheet to mean "white" and "male"), the days on which Martin worked, the number of his working hours (9), his rate of pay (40 cents an hour), and the amount due him ($3.60). Below Martin's name the heading "Laborers" is typewritten, and under that word appear the names of eight persons designated by the letter "C" (meaning "colored" and "male"). Opposite each laborer's name appear the days on which he worked, the hours worked by him, and his wages. Immediately under the name of the last laborer is the typewritten heading "Teams." Under that word appear four names, designated by the letter "C" as being "colored" and "male." The days and hours worked by each team are set out as stated above, and the rate of pay for each team is given as 40 cents.

The "Employer's First Report of Injury" states: "Mr. Martin

was unloading a piece of heavy machinery from freight car, preparing to load on his truck. While doing this, he had hold of the handles of a dolly upon which the machinery was placed. The machinery tilted and pushed Mr. Martin off onto the pavement." It further states that he "hit his head on pavement, knocking him unconscious and bursting a blood vessel, causing his death."

"Under the Georgia statute and decisions, the test to be applied in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and servant, or that of employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract. *Zurich General Accident & Liability Ins. Co.* v. *Lee,* 36 *Ga. App.* 248 (136 S. E. 173); *Quinan* v. *Standard Fuel Supply Co.,* 25 *Ga. App.* 47 (102 S. E. 543); *Mount* v. *Southern Ry. Co.,* 42 *Ga. App.* 546, 550 (156 S. E. 701); *Home Accident Ins. Co.* v. *Daniels,* 42 *Ga. App.* 648 (2) (157 S. E. 245); *Irving* v. *Home Accident Ins. Co.,* 36 *Ga. App.* 551 (137 S. E. 105)." *Yearwood* v. *Peabody,* 45 *Ga. App.* 451 (2) (164 S. E. 901). In *Liberty Lumber Co.* v. *Silas,* 49 *Ga. App.* 262 (2) (175 S. E. 265), the foregoing rule was referred to as the "chief test," and was quoted and followed. In addition to some of the authorities cited in the *Yearwood* case, this last case cites as authority for the rule *Cooper* v. *Dixie Construction Co.,* 45 *Ga. App.* 420 (2) (165 S. E. 152); *Poss Lumber Co.* v. *Haynie,* 37 *Ga. App.* 60 (2) (139 S. E. 127). This principle is fully discussed, and authorities cited, in *Bentley* v. *Jones,* 48 *Ga. App.* 587 (173 S. E. 737). We will supplement the evidence already set out, by stating that it appears that E. G. Martin began working at the Osprey Mills under his contract with Bibb Manufacturing Company sometime in January, 1934, and that his son swore that he thought it took him one or two weeks to complete the work. Measuring this case by the rule hereinbefore stated, we are of the opinion that E. G. Martin was not the servant of Bibb Manufacturing Company, but was an independent contractor. We therefore hold that the judge erred in affirming the award of the Department of Industrial Relations.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*