34909. SMITH *et al. v.* GLOBE INDEMNITY COMPANY *et al.*

Decided January 14, 1954.

*Burt & Burt,* for plaintiffs in error.

*Smith & Gardner, Robert D. Hedrick,* contra.

FELTON, J. As we see it, the claimant contends that her husband was an employee of Gordon Foods, Inc., because his immediate employer, South Georgia Distributing Company, was and is an agent of Gordon Foods, Inc. The question for decision, then, is whether Gordon had or assumed the right of control over the time, manner, and method of the operation of South Georgia Distributing Company. *Bibb Mfg. Co.* v. *Martin,* 53 *Ga. App.* 137, 141 (185 S. E. 137); *Scott* v. *Minor,* 55 *Ga. App.* 714, 716 (191 S. E. 263); *Bituminous Cas. Corp.* v. *Wilkes,* 77 *Ga. App.* 764, 766 (49 S. E. 2d 916). Cases involving this question must be decided on their own particular facts. *Fidelity &c. Co. of New York* v. *Clements,* 53 *Ga. App.* 622 (1) (186 S. E. 764).

We think there is sufficient evidence authorizing the director's award. That evidence is in substance as follows: South Georgia's relationship with Gordon is to buy merchandise from them and resell it. South Georgia bought its own trucks, but Gordon painted them. The reason South Georgia had Gordon paint the trucks was because Gordon painted them without cost to South Georgia. The signs on the trucks read "Gordon's Fresh Potato Chips" and "Gordon Foods," and not "Gordon Foods, Inc." Gordon makes and sells peanut-butter sandwiches and other products. South Georgia can and does sell Gordon products at prices less than those in a schedule of prices given to it by Gordon. Gordon sells merchandise to South Georgia at retail prices and then discounts a certain percentage for prompt payment. South Georgia sells approximately twenty Gordon items. Gordon products amount to only about forty percent of South Georgia's business. South Georgia carries about thirty other lines of products. South Georgia is not required to purchase any certain amount of merchandise from Gordon. South Georgia orders the quantity and variety of merchandise desired from Gordon and Gordon ships it. Gordon never inspects South Georgia's operation nor sends instructions or requirements concerning routemen. The only communication from Gordon to South Georgia concerning customers was from one of Gordon's vice-presidents who had been traveling through South Georgia's territory and had stopped at a service station and a grocery store that did not have any Gordon potato chips, and the vice-presi-

dent asked that a routeman stop by and see the station and store operators. Gordon, like the other lines, would furnish special display racks to put in establishments. In addition to putting out material advertising Gordon's products, South Georgia puts out advertising for its other lines. If Gordon products go stale while in the stores, they are picked up and returned to Gordon and credit is given therefor. If such products go stale while in South Georgia's warehouse or possession, no credit is given and it is South Georgia's loss. If a check is given by a customer, it is made out to South Georgia Distributing Company. Occasionally a check is made out to Gordon, maybe one in a hundred, and it is sent to Gordon for endorsement to South Georgia. South Georgia buys books of sales tickets from Gordon with Gordon's name on the tickets. This is done because South Georgia can buy them cheaper from Gordon than it can purchase its own tickets locally. Gordon prints books of tickets as an economy measure. Many of the persons selling Gordon products have only one truck, and Gordon can save them money by having large amounts of such tickets printed and selling them to those persons at a cheaper rate than they can have them printed locally. There is no written contract between Gordon and South Georgia, only an oral arrangement. When South Georgia was contemplating buying out its predecessor, a Gordon representative talked with South Georgia's representatives and said, "If you boys can get together and buy Hogan out, we'll continue to ship to you." Either party can terminate the relationship at will. South Georgia can sell its business without notice to or consent of Gordon. South Georgia keeps its own employment records, such as deductions for social security, withholding taxes, etc. Gordon does not impose any kind of policy on South Georgia. Gordon never sends instructions or requirements concerning routemen. A Gordon representative testified: "We have a district sales manager that is in the field that goes around. And he probably gets to Albany at sixty to ninety day intervals. And he rides around with the men and sees if he can help him obtain any new business. Usually stays a week with a routeman. Q. He goes out on each route? A. Not necessarily. If Mr. Hedrick hires a new salesman and he wants him to go out with the new salesman, he works with the new salesman all week if he needs new polishing." This man is sent out to assist South Georgia in securing new business.

It is contended that the fact that a representative of Gordon Foods, Inc., would call on South Georgia Distributing Company and occasionally accompany a routeman on his route and assist and "polish" him showed that Gordon directed the activities of South Georgia. We do not agree with the contention. The evidence authorized the finding that this was a good-will representative, who would accompany the routemen and perform certain services if requested by South Georgia. Naturally such representative was interested in new business for South Georgia because the more products South Georgia sold the more products Gordon sold to South Georgia. There is no evidence that Gordon could have its representative accompany the routeman contrary to the wishes of South Georgia Distributing Company. The fact that South Georgia has an exclusive sales territory does not alter the relationship between the parties under the facts of this case.

Because cases involving this question are usually determined by their own particular facts, the cases cited by the claimant are distinguishable from the instant case on their factual differences. It will be well, however, to point out the distinguishing feature in some of those cases cited.

In *Macon Dairies* v. *Duhart*, 69 *Ga. App.* 91 (24 S. E. 2d 732), the alleged employer instructed the drivers as to what routes they would cover and controlled the time of their operation. In *Joiner* v. *Sinclair Ref. Co.*, 48 *Ga. App.* 365 (172 S. E. 754), the contract between the alleged employee and employer clearly showed that the employer controlled or reserved the right to control the manner and method of the employee's operation of the service station. That contract provided in part: that the alleged employee should sell at retail, "at prices fixed by the company, products furnished him by the company in the quantity and kind and variety which in the judgment of the company the business of the service station warrants; that he shall sell the company's products on such terms only as the company may authorize; that he shall operate the station in the manner and according to regulations specified in the contract; that he shall observe the company's rules and instructions applicable to agents and any special instructions which the company may give him." In *Fitts* v. *Zurich General Accident &c. Co.*, 57 *Ga. App.* 301 (195 S. E. 293), there was evidence to authorize the finding that

the alleged employer had the right to direct the employee's activities, in that the company had the right to require the employee to call on a customer or prospective customer of the company's choosing rather than the employee's calling on a customer or prospective customer of his own choosing.

The evidence authorized the award, and the court did not err in affirming the award denying the claim.

*Judgment affirmed. Sutton, C. J., and Quillian, J., concur.*